in the case of Friends of the Capital Crescent Trail v. Army Corps of Engineers and others. Mr. Brown, you have 15 minutes for your opening. Good afternoon, Your Honors, and may it please the Court, David Brown for the three appellants. They ask the Court to vacate the Section 404 permit issued under the Clean Water Act by the Corps of Engineers to the Maryland Transit Administration to degrade the waters and so that MTA can strengthen and widen bridges and roadways in impacted areas to accommodate rail cars along the chosen route for the Purple Line between New Carrollton and Bethesda, Maryland. In a case like this, where the project is not the type that depends upon water access, such as a marina or a dock, MTA is obliged under the Clean Water Act Section 404b1 guidelines to make a clear demonstration rebutting the presumption that there is a way to fulfill the overall project purpose without degrading the U.S. waters or wetlands. But the Corps granted the permit for a rail-based system despite MTA's own evidence that if the mode of transit were buses, there was a realistic possibility of no impact or less impact on U.S. bridges and roadways in the areas where the U.S. waters and wetlands would be subjected to pollution impacts due to such construction. Mr. Brown, Judge Bedard said in his opinion, and the record does seem to bear him out, that you didn't offer specific proposals for the bus alternative routes. And essentially, what Judge Bedard said, if I'm paraphrasing him accurately, is that you can't come in at the last moment, say you should have done a bus alternative, but yet not have a developed plan. How do you answer that statement of Judge Bedard's and his memorandum? Your Honor, we feel that we did adequately bring the better, less environmentally damaging alternative to the attention of the Corps. We did that with former World Bank Group Chief Economist Frank Lissy, who pointed the way with his transportation project expertise, showing that upgraded bus service along the chosen route was the way to go. He and Appellant Fitzgerald did this well enough to alert the Corps of its positions and contentions sufficiently, if I may quote from the public citizens case, to allow the agency to give the issue meaningful consideration. We feel that no one rigorously applying the 404b1 guideline standard could fail to understand that our comments squarely raised a bus and road construction related LEDPA issue, so as to enable its proper resolution with agency expertise. That, in our view, is as far as ordinary citizens concerned about environmental impact of a project need to go in the public comment period. Mr. Brown, weren't you facing an uphill battle because the previous studies had shown that the bus options were not going to be advancing the purpose of creating a more efficient transportation route? The bus options that had been examined had actually shown very slow transit times, had they not? So, didn't you have to show that you could do better, rather than simply raise the idea of a bus option? One has to distinguish between a bus option where there is no improvement to the roadway and guideway, and one where there is very specific improvement, such as exclusive guideways and shared-use lanes, which is exactly what the BRT or bus rapid transit option provides. What MTA presented to the Corps was no information on the practicability of meeting the goal of expedited mass transit service with BRT, except as to three environmentally damaging BRT alternatives considered in the NEPA process. In fact, those three alternatives were found to be inferior to the light rail alternative that was chosen in reducing pollution to the U.S. of a bus rapid transit option that has either zero or minimal impact on U.S. waters and wetlands. We are not claiming that the Corps had an open-ended obligation to consider a variety of BRT configurations in light of the BRT options that were considered in the NEPA process. But given the presumption under the Section 404B1 guidelines that has to be rebutted, we feel it was incumbent upon MTA and the Corps to examine at least one plausible BRT option configuration. Where was the Corps going to get that? I mean, where was it going to come from? You did not There had been examination of bus alternatives. The Corps had to go out and do something entirely different in the permit process. Your Honor, I just do not think under the circumstances of the obligation on the Corps to insist on a clear demonstration that there is no better, less for the Corps to figure out, well, if the main problem with the Mr. Brown, I think I am understanding your point to be that it is an easy enough thing to do, but we are judges. Most of us are not real good in environmental science, and we rely on what is on its own and then assessed or had the parties assess that. I mean, doesn't there have to be an alternative actually brought to its attention? The case law basically is in agreement with you, your Honor. Just to give you an example of why in some respects you are correct, the government relies prominently on the Hillsdale case in which there was a railroad that wanted to build a rail truck terminal near its rail line, and the Corps looked at seven different alternative sites, including two that were presented by the opposing parties. And the Court said that was enough because all of the suggestions that were brought to the attention of the Corps by the opponents were evaluated. In this case, we told the Corps in the public comment period that they could use upgraded bus service without degrading the U.S. waters. And the fact is that instead of the Corps actually considering that possibility that we raised in the public comment period, it was simply ignored in the record memo that the Corps provided. It simply concluded that the analyses that were done in the NEPA process were enough, but the NEPA process did... Mr. Brown, you know, you have a pretty steep hill you're climbing here because you have to meet the arbitrary marginal standard. And how did the Corps' analysis violate that standard? In other words, how did the Corps' analysis, how can it be termed arbitrary? You're just saying the fact it didn't look at the additional bus alternatives, even though the NEPA process did look at them? The NEPA process did not look at an alternative that avoided degrading the waters of the U.S. because the NEPA process was not sensitive to the requirements under the Clean Water Act because the Corps was not either included as a cooperating agency or an agency that was given meaningful input in the selection of processes of choices for route selection. It was left to the last minute, and as a result, it was up to my clients in the public comment period to point out that none of these alternatives that had been presented was presented with any due sensitivity to the obligation to minimize or avoid entirely, if possible, impacts to the U.S. waters. So we feel that we adequately presented an alternative to the Corps and that it was simply ignored. If the Corps in its record memo had said, we've looked at this possibility and find that it's impracticable because it doesn't meet the overall project purpose, that would be one thing, but to simply ignore it is, in our view, arbitrary and capricious. The actual evidence that was in the case with regard to comparison of BRT and LRT certainly made it plausible that this particular alternative, which went unexamined from a transit expedited point of view, would have compared favorably with the BRT options that actually degraded the waterways of the United States. If you looked at the travel times that show up in the joint appendix at page 683 and 917, you would see that on an end-to-end basis, the travel times, which is the critical factor in evaluating the practicability of this project, you would see that the end-to-end travel times for the high investment BRT and the actual chosen lead were the same, 59 minutes. And you would also see that looking at 13 different segments along the route from New Carrollton to Bethesda, in nine of 13 segments, the travel time was even superior for the bus rapid transit option than it was for the light rail option. All of these made it quite obvious that what the MTA needed to do to rebut the presumption that there was a better LEDPA was to examine what those travel times would be if the roads and strengthening bridges in the relatively small proportion of this 16.2 mile rail line, by avoiding construction in those particular areas and doing all of the enhancement, the BRT enhancement outside of that area. That is all that we're saying is flawed with this project. That obvious, what we regard as an obvious practicable alternative was not analyzed and if found to be wanting, have a decision from the core that said, sorry, the LRT option that has been considered in the NEPA process is sufficient and this particular option doesn't do any better job of lessening impact on the waters or doesn't do any better job of lessening transportation, but that analysis simply wasn't done and we see Vegator so that particular analysis can be done. We're not claiming that the NEPA analysis was flawed. We're not complaining that the core couldn't use the NEPA analysis and there were a variety of other straw man arguments in the government's briefs that simply misstate our claims. So, for all of these reasons, we feel that permits should be vacated because NPA failed to meet its section 404B1 guidelines obligation to clearly demonstrate that a non-damaging or at least less environmentally damaging bus-based alternative would not be practicable in meeting the goal of expediting mass transit service in the chosen corridor and the core failed to fulfill its duty to insist on such a clear demonstration from MTA. The permit should be vacated under APA section 7062A because the core failed to consider an important aspect of its statutory obligation under the CWA guidelines resulting in a LEDPA determination that on this record at least is simply too implausible to be an application of agency expertise to which this court should defer. Okay, thank you Mr. Brown. Let's hear from Ms. Ingalls. Good morning and may it please the court. I'm Summer Ingalls here for the U.S. Army Corps of Medics and Mr. Furlow plans to speak for five, but we both ask the court to affirm. The Corps' decision to issue Maryland a dredge and fill permit that would ultimately impact or permanently impact 0.49 acres of wetlands and 5,100 linear feet of streams was reasonable. Those impacts will be spread across a 16-mile route and the Corps conditioned issuance of the permit will ultimately ensure that more wetlands will be enhanced than will be impacted once this project is complete. Plaintiffs assert essentially that the Corps should have done more, but it identifies no flaws with the analysis that the Corps completed and given the comprehensive record before the agency, the project's minor impacts and the regulatory framework here, the plaintiffs can identify no reason to overturn the district court's well-reasoned decision. I'd like to begin first with the opponent's assertion that the agency failed to consider alternatives that were raised with any particularity in plaintiff's comments. The only comments that mentioned specific alternatives mentioned alternatives that were considered in the Corps' analysis. So for example, Mr. Lisi's comments mentioned the transportation systems management alternative and the low investment bus rapid transit alternative. Now the Corps didn't dismiss any bus rapid transit alternative on the ground that it was impracticable. The agency did explain that it had some concerns about how well those alternatives would meet the project purpose because ultimately they resulted in much longer run times from end to end than the light rail alternatives, but it ultimately decided not to select any bus rapid transit alternative as the least environmentally damaging alternative because those alternatives had greater impacts to wetlands than did the medium investment light rail transit alternative. What I'm understanding here, Mr. Brown is saying really the Corps should have done more. What it seemed to do was bootstrap its analysis on the NEPA review and that he provided comments that were never followed up on by the Corps and that this is an incomplete record that that constitutes arbitrary and capricious action by the Corps. Could you address that? Sure. I just... You've got the duty to do more on the ground. You can't just adopt somebody else's analysis. And I think you referenced this in your brief. You do say that you are entitled to rely on the NEPA analysis, but to what extent is the Corps required to do plus? In other words, something an agency has already done plus something else, depending on what the comments are that are being received by the Corps? I have a few answers. The first is that the Corps did not leave these comments unanswered. It collected comments from the public and submitted them to the state of Maryland, which responded or provided answers to these comments for the request for additional information and Maryland's responses began at page 1034 of the Joint Appendix. More specifically, in terms of the Corps' decision to use that record that was compiled by the Federal Transit Administration, that was entirely reasonable. It's anticipated in the pre-existing NEPA analysis and that in most cases that analysis will provide the information necessary to complete a well-reasoned permit analysis. And that made particular sense here because the Federal Transit Administration is the one that has the most expertise when it comes to deciding how to plan and develop these projects. Right. But Mr. Brown's response is that doesn't... The expertise of the prior study was not the web. Sure, of course. And there are several reasons why I think it's unfair to cast the existing NEPA analysis as one that focused specifically on transit and development of alternatives for that purpose. The record shows that even though the Corps wasn't formally designated a cooperating agency during the NEPA review, it was very much involved. Between 2003 and 2014, the Corps was involved in scoping. It was involved in on-the-ground meetings. It submitted comments that clearly were taken to heart by the Federal Transit Administration and resulted in changes in the sorts of alternatives and routing that the agency was considering. The Federal Transit Administration's NEPA analysis also includes a very detailed water resources technical report, which is in the joint appendix at 424 through 84. And it describes all of the wetland impacts, potential mitigation. The wetland delineations in that report were updated between 2011 and 2012, so they were very much up to date. And they identify all of the wetlands and waterways that would be affected. By the time this permit application reached the Corps, the Federal Transit Administration had already completed a very detailed review that not only considered a variety of different project alternatives, but was also developed with an eye towards avoiding and mitigating project impacts to wetlands and waterways. And also, the Corps didn't simply rubber stamp that analysis. It obtained additional information from Maryland's permit application, which has maps identifying all of the affected waterways. It worked with Maryland during preparation of that report to further reduce impacts to waterways from 0.77 acres to 0.49 acres for the alternative that was ultimately selected. And the agency requested additional analyses from Maryland regarding alternatives, selection of the least environmentally damaging alternative or practicable alternative. And as I mentioned, it requested responses from Maryland that were aimed to address the comments the agencies had received about concerns in this particular project. And one other reason why this agency's on a very detailed and comprehensive record, but because the project's impacts are so small, as I said, less than half an acre of permanent impact to wetlands, it was entitled to tailor its analysis to the degree of impact. The Corps' regulations cited in my brief, 40 CFR 230.6B and 40 CFR 230.10, both explain that when the agency is completing the section 404 analysis and deciding whether to issue a permit, the degree of analysis should be tailored to the degree of impact. So it's possible that if a project has significant impacts that weren't to ensure that it really was permitting the least environmentally damaging practicable alternative. But here, given the analysis that the Federal Transit Administration had already completed with the Corps' assistance and the minor impacts overall over the 16-mile route, it was reasonable for the agency to decide that it didn't need to go and search for and create additional alternatives. Now, Ms. Engels, when you're referring to the wetlands affected, you're talking about the half acre, roughly half acre, 0.49. What about the 5,000 and some linear feet of the stream? How does that play into the analysis? They are also part of the analysis. The Corps' regulations at 230.10A3 underscore that when it's completing this sort of analysis and there are impacts to special aquatic sites like wetlands, it should look first and foremost at impacts to those sites. And here, the selected alternative has the fewest impacts to wetlands, which are special aquatic sites, and a little bit more impact to streams and waterways than some of the other practicable alternatives. But the Corps also required a variety of mitigation measures designed to address those impacts overall. Ultimately, coming back to the discussion we had at the beginning, it's the Corps' position that, although it does bear the responsibility to ensure that it's complying with the regulations and identifying the least environmentally damaging practicable alternative, if a party is concerned about the agency's analysis and has been given an opportunity to weigh in as the appellants were here, it should describe in detail the alternative that it would like the agency to consider. At no point in the comments during the NEPA process, during the Clean Water Act analysis, have the appellants articulated exactly what they have in mind for the Corps to consider? Now, they do mention, perhaps, avoiding bridge work or minimizing bridge work or minimizing road widening, but the record explains that the bridges are included in this project to avoid impacts to streams. This is a project that runs east-west, and there are stream resources running north and south, and so it's hard to avoid all those impacts altogether. These bridges are a very important way to further mitigate or to avoid them to the extent that the agency can. In terms of road widening and the bus rapid transit alternative, road widening is an important part of that alternative because the bus rapid transit alternatives anticipate that road widening will allow the creation of special lanes for buses, special turn lanes. It's hard to envision a bus rapid transit alternative that doesn't include those features. I'm happy to answer further questions that the court might have. I don't believe there are any. Judge Rushing, do you have questions? Your man. Okay, thank you. Thank you very much. We ask the court to affirm. And let's hear from Mr. Furlow now. Thank you, Your Honor. May it please the court. Albert Furlow here for MTA. I just want to make three relatively quick observations or points that dovetail into Ms. Angle's argument. Number one, I would invite the court to look at the maps that are in the record that show where these impacts are. And that would be the Joint Appendix pages 981 to 997. And what you'll see there is spread out over those 16.2 miles. There are actually 20 wetland areas that are affected. The largest wetland area affected is 0.23 acres. Okay, and that's at the far eastern end of the project. It's actually being affected for storm water retention. The smallest wetland area that is permitted in this permit is four thousandths of an acre, about 170 square feet. So the wetland, we're not dealing with large wetland areas that are being filled in. These are very small and discreet areas that allow the project to be built. Ms. Angle, could I ask you the same question that I asked Ms. Angle? What are the waterfalls in your view of the, I guess you call it creek, right? Well, because, yes, some of them are streams. They're smaller streams. Even for those, there are 41 different areas where there's impacts to streams. The longest stretch of any stream impact is 1,500 feet. And the shortest is nine feet. And to the extent that these impacts occur, a large portion of those impacts occur in the context of existing streets. Because for the most part, this project, the transit line itself, will run on surface streets, similar to what a bus would do, but except it's on a guideway, a designated guideway. So the stream impacts here, when you look at the record and what the analysis is, these are not overly productive streams. They are short stretches. Many of them are still existing in culverts. And in some places, they don't exist in culverts and we're actually improving the condition of that water flow and water quality by keeping it covered, in a sense. But many of those, those are where the bridges for the projects cross these streams. So it's mostly, not parallel, but transects the streams in question. To the point of putting together an alternative that is a point that's really called hybrid in their brief, when you look at what the comments are, that hybrid analogy, that hybrid alternative doesn't exist. When you look at their comments that were submitted to the Corps, they're advocating for the transportation systems management alternative, which is enhancing buses, doing some street widening, making some other traffic engineering types of changes, or at the low investment bus rapid transit alternative, which the Corps, and both of those alternatives, the Corps did consider. They're included, they analyzed them in their decision memo. They looked at the possible impacts for the transportation systems management alternative. They determined that wasn't going to meet the project's purpose and need, which makes that alternative not practicable. For the low investment bus rapid transit route, they found that that actually had more of a wetland impact than the impacts to begin with, but the bus rapid transit wetlands impact was twice the amount of the selected and permitted alternative here. The third point I'd like to make is to the extent that, Your Honor, Judge Keenan, you were talking with Mr. Brown about the Corps having expertise. I would point this court to the Seventh Circuit decision in the Hoosier Environmental Council versus Corps case, which addressed this question head on. In fact, in a decision written by Judge Posner, he basically said that what the plaintiffs were asking for, and there they were also asking for, you should have looked at different alternatives or a hybrid alternative. What Judge Posner said is that what the plaintiffs are asking for is for the wetlands tail to be In order to do this, the Corps would have to bulk up on its staff with experts on highway design, construction, and transportation. That's not what the Corps does. The Corps is not a transportation agency. It reasonably relied upon the FTA's analysis for transportation needs and issued a permit in accordance with its own regulations. So we would ask that this report be affirmed. I see I'm out of time here. Okay, thank you. And Mr. Brown, your response. Thank you, Your Honor. Counsel said that the Corps did not leave the comments unanswered. In fact, what happened was, and you can see the letter of invitation at pages 1102-04 of the joint appendix, the Corps asked MTA in a very general way to respond to the public comments. It did not specifically ask MTA why our comments should not give rise to any doubt that there was a no available LEDPA superior to the one favored by MTA. And MTA did respond, but those responses, although they were in the record, are not mentioned or relied upon by the Corps in the record memo supporting the permit. It would be nothing more than improper judicial guesswork to ponder whether and to what extent those responses played any role in the decision. Counsel also said that the Corps was very much involved in the route selection process, but you will see on pages 15-19 of our reply brief that we looked at everything in the record that shows the Corps' involvement in the route selection process early on and found that their participation was almost inconsequential to the point that they made one suggestion in one specific location and nothing else. Counsel also refers to mitigation efforts made with regard to the chosen alternative. Those mitigation efforts are legally irrelevant to the adequacy of the LEDPA determination. Counsel also argues that the project impacts are so small that it justifies no further examination of the alternatives. In fact, you will find nothing in the record memo to suggest that the Corps felt that it was in any way relaxing its effort to look at project alternatives by the conclusion that the environmental impacts were small, and we don't agree with that in any way. Counsel also said that it really would be difficult to conceive of BRT without the guideway features that we are advocating, but our point is not that the BRT process should be absent those features. Our point is that those features should be employed outside of the areas where there would be environmental impact. We believe that a very where there would have to be an accommodation along this 16.2 mile route to deal with environmental concerns that the efficacy of expedited mass transit service could probably be just as well featured with a BRT option that was sensitive to avoiding construction in those areas. That is not something that would have been beyond the expertise of the MTA to present in order to if it felt it was impractical or infeasible by way of response to our public comments because our public comments quite clearly raised the problem in sufficient detail to put the agency on notice. It certainly is not the obligation of individuals in the community who are simply concerned about environmental impacts to design and present at the very beginning of the review process in the public comment period, and it's their only opportunity to say anything. Some kind of complete engineer designed alternative. We put the government on notice that there was a better way to do this, and they simply ignored it and let the project go through on the blithe assumption that everything that needed to be considered was considered in the NEPA process that pointedly excluded input and cooperation from the core on the critical CWA permit requirements, which in contrast to the NEPA requirements, imposed real substantive requirements that have to be met. For all those reasons, your honors, we feel that the permit should be vacated and sent back to the drawing board for a much better explanation. Perhaps the kind of explanation that you heard from Mr. Furlow might well justify the same conclusion again, but it's not in the record. It's not in the decision. It's not in the rationale of the agency. What you have instead here in this court are counsel's post hoc rationalizations, not the reasons and arguments advanced by the core in its record memo. Thank you, your honor. Okay. Thank you very much, Mr. Brown, Mr. Furlow, Ms. Engels. We appreciate your argument and all of your work that you've done in presenting the case to the court. And at this point, I would ask our judges to take a short break just so that I can look in to see why my computer is flickering. Would that be okay if we take a 10 minute break, Judge Quattlebaum, Judge Rauschen? Sure. Thank you. The court will take a brief recess before hearing the next case.
judges: Barbara Milano Keenan, A. Marvin Quattlebaum Jr., Allison J. Rushing